IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

METROPOLITAN GOVERNMENT OF )
NASHVILLE AND DAVIDSON )
COUNTY, TENNESSEE, )
                                )      NO. 3:22-cv-540
      Plaintiff, )      JUDGE RICHARDSON
                                )
v. )
                                )
FEDERAL EMERGENCY )
MANAGEMENT AGENCY, et al., )
                                )
      Defendants. )
                                )

## MEMORANDUM OPINION

This case arises out of the historic 2010 Nashville floods and their aftermath. In particular, it involves the unsuccessful effort of Plaintiff, the Metropolitan Government of Nashville and Davidson County ("Metro Nashville"), to obtain specific federal disaster-assistance funding from Defendant Federal Emergency Management Agency ("FEMA"). Herein, Metro Nashville has brought claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, against FEMA and Deanne Criswell, who is sued solely in her official capacity as Administrator of FEMA; Metro challenges FEMA's decision not to consider Metro Nashville's administrative appeals of FEMA's denial of such disaster assistance due to their alleged untimeliness. Metro Nashville does not ask this Court to award monetary relief, but rather requests that the Court (i) set aside FEMA's determination that the appeals were properly denied due to the (alleged) tardiness of their filing, and (ii) order FEMA to fairly and impartially consider the merits of Metro Nashville's appeals.

Pending before the Court is "Defendants' Motion to Dismiss" (Doc. No. 20, "Motion"), supported by an accompanying memorandum (Doc. No. 21, "Memorandum") and numerous

exhibits thereto. Plaintiff filed a response in opposition (Doc. No. 26, "Response"), to which

Defendants filed a reply (Doc. No. 27-1, "Reply").

An overview of Metro Nashville's claims and contentions in this case is provided to a good

extent by the "Introduction" portion of Metro Nashville's Response:

> More than 12 years ago, the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro Nashville"), experienced such catastrophic flooding that the incident was declared a major disaster by the President of the United States under the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). 75 FR 26977-03 (May 13, 2010). This declaration for the "2010 Floods" covered the Metro Nashville area and activated the Public Assistance Program of the Federal Emergency Management Agency ("FEMA"). As an eligible applicant under the Stafford Act, Metro Nashville applied for assistance seeking reimbursement from FEMA of costs it incurred to repair and restore disaster damage, and also costs required to reduce the likelihood of damage from future flood disasters.

> Pursuant to the applicable Program requirements, Metro Nashville submitted funding requests, eventually captured in various Project Worksheets ("PWs"), for costs incurred for the response effort to this historic flood and to restore and mitigate damaged facilities. FEMA denied two of Metro Nashville's requests for assistance. FEMA denied Metro Nashville's entire hazard mitigation request for $11,037,918.44 to fund the relocation of critical electrical generation components outside of the floodplain as a means to reduce future damage to Metro Nashville's K.R. Harrington Water Treatment Facility ("Hazard Mitigation Denial"). DE 1 at ¶¶ 41-42. FEMA also denied $291,673 of Metro Nashville's $2,602,955.39 cost to decontaminate Metro Transit Authority buildings that suffered flood damage because FEMA alleged that an insurance deduction was required ("Insurance Deduction Denial"). DE 1 at ¶¶ 43-46.

> The Stafford Act provides applicants for assistance, like Metro Nashville, a statutory right of appeal ("Right of Appeal"). Pursuant to Stafford Act § 423([A]); 42 U.S.C. § 5189a(a): "Any decision regarding eligibility for, from, or amount of assistance under this subchapter may be appealed within 60 days after the date on which the applicant for such assistance is notified of the award or denial of award of such assistance." FEMA's regulations in effect at the time of the 2010 Floods, and through 2021, stated, "Time Limits. (1) Appellants must file appeals within 60 days after receipt of a notice of the action that is being appealed." 44 C.F.R. § 206.206(c) (2010).

> It is undisputed that Metro Nashville timely appealed both the Hazard Mitigation and Insurance Deduction Denials in accordance with FEMA regulations. However, FEMA's Regional Administrator for Region IV, and, later, the Director

of FEMA's Public Assistance Division denied these appeals without considering either on the merits. DE 21-5 at 2 & DE 21-8 at 2. These appeals were instead denied solely because a third party, the Tennessee Emergency Management Agency ("TEMA"), which is designated in FEMA's regulations as the entity to receive all Tennessee applicants' appeals and to forward them to FEMA, allegedly did not do so within the 60 days now being required by FEMA.

Metro Nashville thereupon filed for judicial review of FEMA's denials, because FEMA's refusal to consider its administrative appeals plainly violates Metro Nashville's statutory Right of Appeal. Metro Nashville's Complaint respectfully asks this Court, under the Administrative Procedure Act ("APA") 5 U.S.C. §§ 701, et seq., to set aside FEMA's decision as contrary to law, and to direct FEMA to consider Metro Nashville's administrative appeals on their merits.

(Doc. No. 26 at 1-3) (footnotes omitted). The Court accepts this summary as an accurate recounting of what Metro Nashville is alleging. And as discussed below, for present purposes the Court accepts as true Metro Nashville's factual allegations.[1] It is worth adding, though, that FEMA's denial was based in particular on paragraph (2) of 44 C.F.R. § 206.206(c) (2010), (Doc. No. 1 at ¶ 82), which at the relevant time provided that "[t]he grantee [in the instant case, TEMA] will review and forward appeals from an applicant or subgrantee [in the instant case, Metro Nashville], with a written recommendation, to [FEMA's] Regional Director within 60 days of receipt." 44 C.F.R.§ 206.206(c)(2) (2010).

<u>THE INSTANT MOTION</u>

Defendants' Motion is brought pursuant to both Rule 12(b)(1) and Rule 12(b)(6), which contemplate dismissal for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted, respectively. According to the Memorandum, "Metro Nashville's allegations demonstrate both that the Action should be dismissed for failure to state a claim under

---

[1] On the other hand, the Court does not accept as *true* Metro Nashville's asserted *legal conclusion* that "FEMA's refusal to consider its administrative appeals plainly violates Metro Nashville's statutory Right of Appeal." Instead, as indicated below, it asks whether this legal conclusion is at least *plausible* given the factual allegations that the Court accepts as true.

the Administrative Procedure Act [APA] and for lack of subject matter jurisdiction." (Doc. No. 21 at 8). In the Memorandum, Defendants explain that to the extent that the Motion seeks dismissal under Rule 12(b)(1) for lack of subject-matter jurisdiction, it presents a *facial*—not factual—attack of subject-matter jurisdiction. (Doc. No. 21 at 8).

<u>STANDARDS UNDER RULE 12(b)(1) AND RULE 12(b)(6)</u>

!    As the parties mutually agree, in assessing a facial challenge to subject-matter jurisdiction, the Court must take as true all material factual allegations in the complaint and construe those allegations in a light most favorable to the plaintiff. (Doc. No. 21 at 7 (citing *United States v. Richie*, 15 F.3d 592, 598 (6th Cir. 1994)); Doc. No. 26 at 4). The parties likewise mutually agree that to survive a challenge under Rule 12(b)(6), a complaint must contain factual allegations (all of which the Court takes as true) that support a claim to relief that is facially plausible and raise a right to relief above the speculative level. (Doc. No. 21 at 6-7 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); Doc. No. 26 at 4).

Notably, on a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir. 2008). To put it only slightly differently, "[a] Rule 12(b)(6) movant 'has the burden to show that the plaintiff failed to state a claim for relief.'" *Willman v. Att'y Gen. of United States*, 972 F.3d 819, 822 (6th Cir. 2020) (quoting *Coley v. Lucas Cnty.*, 799 F.3d 530, 537 (6th Cir. 2015)). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any below-discussed allowable materials outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of

thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

Defendants correctly note that "[t]he court's inquiry on a Rule 12(b)(6) motion is generally limited to the complaint and without resort to matters outside the pleadings." (Doc. No. 21 at 11 n.6). But it is also true that—at least with respect to exhibits and documents as to which authenticity is undisputed—the Court may also "'consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein.'" *Id.* (quoting *Gavitt v. Born*, 835 F.3d 623, 629 (6th Cir. 2016)). And the Court is satisfied that the same is true on a Rule 12(b)(1) facial attack. *Cf. Lawrence v. United States*, 597 F. App'x 599, 602 (11th Cir. 2015) ("District courts may properly consider documents attached to a motion to dismiss in considering a facial attack if the documents are central to the plaintiff's claim and their authenticity is not disputed.").

Defendants seek to rely on certain documents that (at least in their view) fall into one of these categories of extra-complaint documents additionally appropriate for consideration. But the problem for Defendants is that in key places they cite such a document not for an acceptable purpose for which they may be cited—such as to supplement or contradict the complaint's characterization of the document or the information contained therein—but rather to have this

Court accept hearsay[2] contained in such documents,[3] i.e., to have the Court accept particular factual assertions therein for the truth of the matter asserted in an effort to blunt or contradict the Complaint's allegations—something the Court simply should not and will not do.

Defendants indicate that they are proceeding under Rule 12(b)(6) to the extent that they argue that Metro Nashville's appeal was untimely and *must* be—and properly was—denied based on that untimeliness alone. (Doc. No. 21 at 2).[4] Defendants additionally indicate that they are proceeding under Rule 12(b)(1) to the extent that they are arguing alternatively that even if untimely appeals need not *necessarily* be denied and that instead FEMA has the discretion to

---

[2] The Court realizes that although the assertions it is talking about here constitute hearsay, the assertions conceivably could ultimately be admissible under the Federal Rules of Evidence under some exception to the rule that generally excludes hearsay (Rule 802). But that possibility is irrelevant here. The Court's point here is that merely because a document is referred to in (and central to) the complaint does not mean that the moving defendants can rely on their (or their employee's) own self-serving factual assertions in the document to refute the plausibility of particular factual allegations (or the overall theory) of the plaintiff—particularly where, as here, the plaintiff's whole theory is that the document is wrongheaded as a whole and with respect to the discrete factual assertions at issue. This point is not undermined by the possibility that the defendant(s) conceivably could make some use of such assertions, under the Federal Rules of Evidence, on a motion for summary judgment or at trial.

[3] As discussed below, one important place where Defendants take this tack is where they cite Exhibit 6 to their Memorandum (Doc. No. 21-6) for the proposition that TEMA's letter forwarding Metro Nashville's Hazard Mitigation Appeal (as defined below) "was not received by FEMA until February 8, 2017." (Doc. No. 21 at 13).

[4] Oddly, at the cited place in their Memorandum, Defendants here summarize their argument as: "When an appeal is untimely it *can* be and routinely is denied without reaching the merits[, which] is what FEMA did in each of Metro Nashville's First Appeals." (Doc. No. 21 at 2) (emphasis added). The word "can" here is inapt, because it is quite clear that Defendants' argument here (its primary argument) is that an untimely appeal *must* be denied because (according to Defendants) FEMA lacks authority to extend the appeal deadline to consider an otherwise untimely appeal. For example, Defendants argue that "[n]either the Stafford Act nor Title 44 of the Code of Federal Regulations authorize FEMA to grant time extensions for filing appeals . . . . If an appeal is untimely, the applicant's right to appeal FEMA's eligibility determination is exhausted, the opportunity to seek remedy through the administrative appeal process lapses, and FEMA's decision becomes final." (Doc. No. 21 at 5). And this has to be Defendants' actual primary argument, or else its alternative argument (which is based on assuming arguendo that FEMA *does* have the authority to extend the appeal deadline) makes no sense; the alternative argument addresses the scenario wherein FEMA does have the authority to extend the appeal deadline, in contrast to the scenario Defendants attempt to establish in their primary argument, which is that FEMA has no such authority and so an untimely appeal *must* be denied.

consider untimely appeals, the decision here not to consider Metro Nashville's allegedly untimely appeals would fall within the exclusive discretion of FEMA—thus making the decision not subject to judicial review, because the Federal Government has not waived sovereign immunity for exercises of discretionary authority under the Stafford Act. (*Id.*).

The co-existence of these arguments raises an issue regarding the order and manner in which they should be addressed. Ordinarily, the Court must address challenges to its subject-matter jurisdiction first; this makes sense because if the Court lacks subject-matter jurisdiction, it should not be making merits-based decisions of the kind typically implicated by a Rule 12(b)(6) motion. The Court will do so here, and indeed it can dispose of Defendants' (alternative) challenge to subject-matter jurisdiction, at least as it is currently presented via a facial attack. As presented, this challenge would gain traction only if the Court were to find for present purposes that FEMA's decision not to extend the purported deadline for TEMA's forwarding of Metro Nashville's appeal (in order to consider an otherwise untimely appeal) was a discretionary act. On the current facial challenge, however, the Court cannot so find; neither the Complaint, nor anything else that the Court properly can consider on a facial challenge, supports a finding for present purposes that this was a discretionary act. Metro Nashville makes the point well:

> In an attempt to shoehorn an argument into the Motion to Dismiss that the Stafford Act § 305 "discretionary function" exception limits this Court's APA jurisdiction over the claims at issue, FEMA has mischaracterized Metro Nashville's Complaint. The Motion to Dismiss states: "The premise urged by Metro Nashville here--that FEMA ought to have considered Metro Nashville's appeals on the merits despite their untimeliness--unquestionably arises from a purely discretionary act." DE 21 at p. 17.
>
> That is simply not what is set forth in the Complaint, either explicitly or implicitly. To be clear, Metro Nashville has pled that it timely appealed FEMA's Hazard Mitigation Denial ("Mitigation Appeal") and FEMA's Insurance Deduction Denial ("Insurance Deduction Appeal"), and that FEMA's actions to procedurally deny the Appeals based on untimeliness violates Metro Nashville's statutory Right of Appeal. DE [1] ¶¶ 3, 48, 62, 87, 96, 110, & 116. It is central to each of Metro

Nashville's four causes of action that the Stafford Act does not afford FEMA any discretion under the facts pled to deny Metro Nashville's Right of Appeal. DE 1 at ¶¶ 92, 101, 111, & 117. FEMA did not assert that it was exercising discretion in refusing to consider Metro Nashville's administrative appeals. Moreover, the Complaint included an Appendix 2 which lists 44 FEMA administrative appeal decisions – from March 2017 onward – which denied consideration of appeals where the state had forwarded the appeal more than 60 days after the state had received it. Notably, in none of these appeal decisions did FEMA assert that it had discretion to consider the appeal on the merits. Instead, FEMA took the position that – at least as FEMA has interpreted its appeal regulation from 2017 on – "Applicant's appeal rights lapsed prior to FEMA's receipt of the second appeal." Instead, FEMA appears to have adopted a new interpretation of a long standing regulation – and concluded that FEMA had no discretion to consider an appeal that had not been filed on time because its appeal rights had lapsed. Indeed, in several cases listed in Appendix 2 to the Complaint, FEMA asserted that it had no authority to consider the appeals as a matter of law. DE 1-7.

(Doc. No. 26 at 5-6) (footnote omitted). The Court agrees with Metro Nashville that considering what the Court must take as true (and what the Court conversely *cannot* assume to be true or conjure up on its own), there is no basis on the instant facial attack to treat FEMA's denial of Metro Nashville's appeals for alleged untimeliness as a discretionary act, rather than an act taken by FEMA under the premise that (in the post-March 2017 period), such a denial was *required* and thus actually involved no exercise of discretion.[5] In the Court's view, if an agency *actually* treats a denial as non-discretionary, then the Court should not treat the act as discretionary for purposes of the discretionary-function exception—even if the agency *could or should have* treated the denial as discretionary under applicable law. And here, construing the allegations of paragraph 72 (regarding the denial of the Insurance Deduction Appeal) and paragraph 74 (regarding the denial

---

[5] The Court notes that it does not accept as true Metro Nashville's assertion that the Stafford Act does not afford FEMA any discretion under the facts pled to deny Metro Nashville's Right of Appeal. This legal conclusion, unlike a factual allegation, is not entitled to the presumption of truth. Having said that, as discussed below, the Court does find that the legal conclusion is plausible (especially though not exclusively with respect to the Hazard Mitigation Appeal) based on the factual allegations of the Complaint. In any event, the Court here does not rely—and does not need to rely—on this legal conclusion to find that Defendants' challenge to subject-matter jurisdiction is a non-starter in its current form; instead the Court can and does rely exclusively on the fact that the Complaint (especially as construed in Plaintiff's favor) alleges as a factual matter that FEMA's denials of Metro's appeals did not involve an exercise in discretion.

of the Hazard Mitigation Appeal)[6] in Metro Nashville's favor as required at this stage, the Court finds that Metro Nashville has plausibly alleged that FEMA's denial of these two appeals involved no discretionary act. This conclusion is bolstered by the (terse) language of the first appeal and second appeal determinations (for each of the two appeals) filed by Defendants; each suggests that FEMA denied the appeals solely because the appeals were late, i.e., not filed within the applicable 60-day deadline, without any recognition or exercise of any discretionary authority to waive or extend the deadline. (Doc. Nos. 21-1 at 2; 21-5 at 2; 21-6 at 2; 21-8 at 2).

Moreover, Metro Nashville has plausibly alleged (with supporting factual allegations) that since March 22, 2017—prior to FEMA's denial on first appeal and then second appeal of the Hazard Mitigation Appeal and the Insurance Deduction Appeal—"FEMA [has continually asserted] as a matter of policy that, pursuant to 44 C.F.R. § 206.206(c)(2), FEMA *was without authority* to consider appeals which had been timely submitted by applicants under Stafford Act § 423 but forwarded to FEMA by State grantees beyond 60 days." (Doc. No. 1 at ¶ 82) (emphasis added). This further supports the notion that the relevant denials here were not viewed as discretionary.

Alternatively, the Court notes that as discussed below, Metro Nashville has asserted the legal conclusion that FEMA—contrary to FEMA's alleged most recent view that it lacks discretion *not* to deny appeals in the case of a failure to meet the 60-day deadline—lacked discretion under the Stafford Act to deny the appeals based on TEMA's not meeting the 60-day deadline set forth in 44 CFR 206.206(c)(2). This assertion turns primarily on whether 44 CFR 206.206(c)(2) is

---

[6] These paragraphs allege that the respective appeals were denied (i.e., that "FEMA refused to consider" them) "solely because FEMA asserts it did not receive the [respective appeals] from TEMA within 60 days of TEMA's receipt of the [respective appeals] from Nashville from Metro Nashville." (Doc. No. 1 at ¶¶ 72, 74). Construed in Metro Nashville's favor, the allegation here is that FEMA's decision, being based "solely" on the alleged failure to meet the applicable 60-day deadline, necessarily was not based in any way on any discretionary factors or consideration of any discretion to excuse the 60-day deadline.

entitled to so-called *Chevron* deference. As discussed below, it would be premature for the Court at this stage to answer that question. And so it would be premature for the Court to determine at this stage whether Metro Nashville is correct that FEMA lacked discretion under the Stafford Act to deny the appeals based on TEMA's not meeting the 60-day deadline. This is another reason why the Court cannot at this stage pronounce that FEMA indeed had the authority and the discretion to deny the appeals based on TEMA's not meeting the 60-day deadline, such that it could and did exercise such discretion in this case; it is not yet clear that FEMA legally even had that discretion.

The Court is aware that in confronting essentially the same argument from FEMA in *City of Pembroke Pines v. FEMA*, 510 F. Supp. 3d 1126 (S.D. Fla. 2021), the court there applied the standard that "[w]here subject matter jurisdiction is challenged on the basis of sovereign immunity, the '[p]laintiff bears the burden of showing Congress's unequivocal waiver of sovereign immunity.'" and determined that the plaintiffs there had not met their burden. *Id.* at 1136 (quoting *St. Tammany Par., ex rel. Davis v. FEMA*, 556 F.3d 307, 315 (5th Cir. 2009)); *see id.* at 1131, 1138. The Sixth Circuit recognizes the same burden, *see, e.g., L. C. v. United States*, 83 F.4th 534, 543 (6th Cir. 2023), but as noted above Plaintiff has met its burden to plead around sovereign immunity by alleging facts plausibly suggesting that the act was nondiscretionary; whether the plaintiffs in *City of Pembroke Pines* did likewise is a different, case-specific question. *See id.* at 1138 ("[T]he issue here is whether the plaintiff have alleged—or can allege—facts that show FEMA did *not* act in a discretionary manner.") And to the extent that *City of Pembroke Pines* suggests that a plaintiff "can [*never*] allege . . . facts that show FEMA did *not* act in a discretionary manner" in a particular case, the undersigned respectfully disagrees with that non-binding authority; he believes that it is possible for a plaintiff (like Metro Nashville here) to plead around the discretionary-function exception to subject-matter jurisdiction via factual allegations that

plausibly suggest that FEMA's denials of the appeals were in fact nondiscretionary because they were made without any consideration or exercise of discretion.

For all of these reasons, the Court finds that Metro Nashville has met its burden in defeating a sovereign-immunity-based (facial) challenge to subject-matter jurisdiction by pleading facts suggesting the inapplicability of the discretionary-function exception. Thus, the Court finds that Plaintiff has met its burden to establish subject-matter jurisdiction.[7]

<u>LEGAL PRINCIPLES CONCERNING STAFFORD ACT AND APA</u>

Defendants set forth a primer on relevant law that (except as qualified by the Court herein via bracketed material) the Court accepts as valid. Notably, Defendants' discussion (though framed in the present tense) appears geared to the Stafford Act and regulations as they were at relevant times and not as they subsequently were amended in part. As Defendants note regarding disaster-assistance statutory and regulatory provisions: !

> FEMA is a component of the United States Department of Homeland Security [DHS] and is responsible for, among other things, administering and coordinating the federal government response to presidentially declared disasters pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("the Stafford Act"), 42 U.S.C. § 5121 et seq. The President directs FEMA to provide federal assistance to a state under the Stafford Act by declaring an affected area to be a "major disaster." The President may authorize a major disaster only upon the request of a governor specifying that effective response is beyond state and local capabilities and the governor certifies that state and local government obligations will comply with cost sharing requirements of the Stafford Act. Upon such presidential declaration, the governor's authorized representative executes with FEMA a FEMA-State Agreement in which the state agrees to abide by all

---

[7] The Court notes that it does not see any other impediment to its subject-matter jurisdiction, either. "In the case *sub judice,* plaintiffs seek declaratory and injunctive relief from FEMA's decisions. Subject matter jurisdiction is present because it 'arises under the Stafford Act.'" *Lockett v. Fed. Emergency Mgmt. Agency*, 836 F. Supp. 847, 851 (S.D. Fla. 1993) (citing 28 U.S.C. § 1331 and *Choctaw Mfg. Co. v. United States,* 761 F.2d 609, 615 (11th Cir.1985)). "The Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.,* grants plaintiffs' their right to have a federal court review these administrative decisions," but that right is subject to certain qualifications. *See id.* (identifying the relevant qualification in that case as the requirement that the decision be "final"). Defendants do not contend that any qualifications for subject-matter jurisdiction (beyond the absence of sovereign immunity) are unsatisfied in the present case.

statutory and regulatory requirements for the receipt and administration of federal assistance. For the President's disaster declaration for flooding in Tennessee in 2010, James H. Bassham of TEMA executed the FEMA-State Agreement as the governor's authorized representative.

The President's disaster declaration authorized FEMA to provide, among other things, its PA program which provides financial assistance in the form of grants to local government entities, among others, for debris removal, emergency protective measures, and the repair of public infrastructure. FEMA awards all PA funding through the state as the grantee "accountable for the use of" the funding, 44 C.F.R. § 206.433, and responsible for passing through the funding to subgrantees and ensuring all FEMA grant requirements are adhered to. For the 2010 flooding disaster in Tennessee, Metro Nashville received financial assistance as a subgrantee from a FEMA grant to TEMA, as the grantee.

Section 705 of the Stafford Act, 42 U.S.C. § 5205, governs disaster grant closeout procedures. Those procedures provide how FEMA is to proceed once all work is complete and final accountings are made. Consistent with those provisions, uniform administrative requirements regarding audits apply to all disaster assistance grants and subgrants. See 44 C.F.R. § 206.207. That audit function is carried out by the DHS Office of Inspector General ("OIG") according to generally accepted government auditing standards. The objective of these audits is generally to determine whether the subgrantee accounted for and expended FEMA funds according to federal regulations and FEMA guidelines. Where a subgrantee has failed to properly account for funds or improperly expended those funds, the OIG recommends to the relevant FEMA Regional Administrator that they disallow ineligible charges, which may result in the deobligation of the funds allocated to the projects that generated ineligible charges.

FEMA's regulations provide for two levels of administrative appeal where the grantee or subgrantee will have the opportunity to challenge FEMA's decision regarding deobligation. See 44 C.F.R. § 206.206(b) ("The Regional Administrator will consider first appeals for public assistance-related decision[s]," and "[t]he Assistant Administrator for the Disaster Assistance Directorate will consider appeals of the Regional Administrator's decision on any first appeal under paragraph (b)(1) of this section."). Section 423(a) of the Stafford Act provides that "any decision regarding eligibility for…assistance under this title may be appealed within 60 days after the date on which the applicant for such assistance is notified of the award or denial of award of such assistance." 42 U.S.C.§ 5189a(a). [According to FEMA's regulations, but not necessarily Section 423(a) of the Stafford Act,] [t]he 60-day time limit applies to both first and second appeals. 55 Fed. Reg. 2297, 2300 (Jan. 23, 1990).

Under FEMA's implementing regulations, 44 C.F.R. § 206.206, within 60 days of receiving an applicant's appeal, a grantee is to review and forward the appeal to FEMA with a written recommendation. 44 C.F.R. § 206.206(c)(2).

Neither the Stafford Act nor Title 44 of the Code of Federal Regulations authorize FEMA to grant time extensions for filing appeals. *See* 55 Fed. Reg. 2297-01, 2299 (Jan. 23, 1990) ("The 60-day limit for submission of the appeal is contained in the Act and thus cannot be extended…However, the 60-day limit applies separately to the actions of the subgrantee and the grantee, and not to the combined actions of those two parties."). It is nevertheless true that Stafford Act § 301, 42 U.S.C. § 5141, allows FEMA to modify or waive certain administrative conditions for assistance following a major disaster. However, this applies if and only if "the inability to meet such conditions is a result of the major disaster." Id. Therefore, [according to Defendants] if either the applicant/subgrantee or grantee fails – without major disaster related justification – to meet their respective 60-day deadlines, the appeal is untimely.

[According to Defendants,] [i]f an appeal is untimely, the applicant's right to appeal FEMA's eligibility determination is exhausted, the opportunity to seek remedy through the administrative appeal process lapses, and FEMA's decision becomes final. [According to Defendants], FEMA has consistently enforced this timeliness requirement. *See, e.g.*, FEMA Second Appeal Analysis, Fla. Dep't. of Transp., FEMA-4068-Dr-FL, at 3-4 (Aug. 5, 2016) (FEMA found appeal untimely because grantee submitted it outside of the 60-day deadline, even though applicant was timely); FEMA Second Appeal Analysis, Nashville-Davidson County, FEMA-1909-DR-TN, at 3 (Apr. 23, 2018) (same); FEMA Second Appeal Analysis, Municipality of Mayaguez, FEMA-1247-DR-PR (July 19, 2004) (same); FEMA Second Appeal Analysis, James City Cty., FEMA-1491-DR-VA (June 17, 2005) (same); FEMA Second Appeal Analysis, Ransom Cty., FEMA-1713-DR-ND (Apr. 27, 2012) (same).

Last, Section 325 of the Stafford Act, 42 U.S.C. § 5165c provides for a notice and comment period for any new or modified policy that governs implementation of FEMA's PA program that could result in "significant reduction of assistance under the program." 42 U.S.C. § 5165c(a)(1). Furthermore, if FEMA implements such a new policy, FEMA cannot apply it retroactively, i.e., to disasters that took place before the date that the policy takes effect. 42 U.S.C. § 5165c(a)(2).

(Doc. No. 21 at 2-6) (some citations and footnote omitted).[8] And regarding the APA, and the

related topics of so-called *Chevron* deference and *Auer* deference, Defendants explain:

Under the APA, a final agency decision must be affirmed unless it is arbitrary, capricious an abuse of discretion, or otherwise not in accordance with the

---

[8] Consistent with the above terminology used by Defendants, the Court herein uses the term "first appeal" to refer to the first-level appeal (handled by FEMA's Regional Administrator) and the term "second appeal" to refer to the second-level appeal (handled by FEMA's Assistant Administrator for the Disaster Assistance Directorate). In the instant case, there were first and second appeals of both the Hazard Mitigation Denial and the Insurance Deduction Denial. Notably, a second appeal is a final (administrative) appeal.

law, or if the action failed to meet statutory, procedural, or constitutional requirements. 5 U.S.C. § 706(2); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 41[6] (1971). While the Court must engage in a "thorough, probing, in-depth review" of a final agency decision, the decision is entitled to a presumption of regularity and must be upheld as long as there is a rational basis for it. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 415.

Judicial review of an agency's interpretation of a statute follows a familiar two-step inquiry. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). First, the Court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue," the Court will give effect to an agency's interpretation so long as it is a "permissible construction of the statute." *Id.* at 843.

With regard to an agency's interpretation of its own regulation, the standard is similarly deferential and the agency's interpretation will be upheld unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)) (internal quotation marks omitted); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (affirming that "the agency's reading must fall 'within the bounds of reasonable interpretation'") (quoting *Arlington v. FCC*, 569 U.S. 290, 296 (2013)). In addition, agency decisions that involve technical expertise should be accorded a heightened degree of deference. See *Marsh v. Oregon Nat'l Res. Council*, 490 U.S. 360, 377 (1989).

(*Id.* at 8-9).

## *CHEVRON* DEFERENCE AND *AUER* DEFERENCE

The Court will elaborate here on so-called *Chevron* deference and *Auer* deference because

(as Defendants have suggested in the language just quoted) these principles are at least ostensibly

implicated by the Motion. As the Supreme Court has noted:

*Chevron* is rooted in a background presumption of congressional intent: namely, "that Congress, when it left ambiguity in a statute" administered by an agency, "understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley v. Citibank (South Dakota), N. A.,* 517 U.S. 735, 740–741, 116 S. Ct. 1730, 135 L.Ed.2d 25 (1996). *Chevron* thus provides a stable background rule against which Congress can legislate: Statutory

ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency.

*City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013). "[T]he question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*." *Id.* at 297. As the Sixth Circuit has explained: "[w]e apply *Chevron* when 'Congress delegated authority to the agency generally to make rules carrying the force of law' and 'the agency interpretation' in question 'was promulgated in the exercise of that authority.'" *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 898 (6th Cir. 2021) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S. Ct. 2164, 150 L.Ed.2d 292 (2001)). The Sixth Circuit had previously said:

> "First, always, is the question whether Congress has directly spoken to the *precise question at issue.* If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.,* 19 F.3d 270, 273 (6th Cir. 1994) (emphasis in original) (citing *CenTra, Inc. v. United States,* 953 F.2d 1051 (6th Cir. 1992)). The Supreme Court has explained that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear legislative intent." *Chevron,* 467 U.S. at 843 n. 9, 104 S. Ct. 2778.

> Second, if we determine that Congress has not directly addressed the precise question at issue, that is, that the statute is silent or ambiguous on the specific issue, we must determine "whether the agency's answer is based on a permissible construction of the statute." *Jewish Hosp., Inc.,* 19 F.3d at 273. In assessing whether the agency's construction is permissible, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [we] would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 273–74 (citing *Chevron*, 467 U.S. at 843 n. 11, 104 S. Ct. 2778). In fact, the agency's construction is entitled to deference unless "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S. Ct. 2778.

*Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 408–09 (6th Cir. 2007) (some citations omitted).

But in the analysis of whether *Chevron* deference applies, there is actually a step (or what might

more precisely be called a pre-step) that precedes the above-referenced two steps; this pre-step determines whether *Chevron* deference is precluded from the very outset, such that the above-referenced two questions need not even be reached. As Judge Murphy has aptly noted:

> Some viewed [*Chevron*] as creating a broad rule that Congress impliedly delegated to agencies the power to resolve all ambiguous provisions across all statutes. [Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 Duke L.J. 511, 516]; *cf. City of Arlington v. FCC*, 569 U.S. 290, 296, 133 S. Ct. 1863, 185 L.Ed.2d 941 (2013).

> Yet the [Supreme] Court has not adopted that absolutist view. Rather, before proceeding through *Chevron*'s two-step test, it has repeatedly conducted a threshold inquiry (what some have labeled *Chevron* "step zero") that requires us to ask whether the specific statute at issue leaves the specific interpretive question for the agency or the courts to resolve. [Thomas W. Merrill & Kristin E. Hickman, *Chevron's Domain*, 89 Geo. L.J. 833, 836, 873–89]. As the Court has noted, "different statutes present different reasons for considering respect for the exercise of administrative authority or deference to it." *Mead*, 533 U.S. at 238, 121 S. Ct. 2164. The Court thus will reject *Chevron* deference when a law is best read not to give the agency the power to resolve a particular question of statutory interpretation. That is true even if (as in this case) the agency issued a regulation answering that question pursuant to its general rulemaking authority.

> Two examples prove my point. The Court has rejected *Chevron*'s implied-delegation presumption for "major questions" about a statute. *See King*, 576 U.S. at 485–86, 135 S. Ct. 2480; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60, 120 S. Ct. 1291, 146 L.Ed.2d 121 (2000). "In extraordinary cases" involving important questions, it has noted, "there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Brown & Williamson*, 529 U.S. at 159, 120 S. Ct. 1291 (citing Breyer, *supra*, at 370). Take *King*. It addressed whether the Affordable Care Act allowed individuals who bought health insurance on federal exchanges to obtain tax subsidies. 576 U.S. at 479, 135 S. Ct. 2480. The agency issued a regulation answering this question under a grant of rulemaking authority. *Id.* at 483, 135 S. Ct. 2480. Yet the Court refused to give *Chevron* deference to this regulation. *Id.* at 485–86, 135 S. Ct. 2480. The Court reasoned that the question was of "deep 'economic and political significance,'" so it presumed that Congress would not have impliedly given the agency the power to resolve it. *Id.* at 486, 135 S. Ct. 2480 (citation omitted).

> The Court has also rejected *Chevron* deference for statutory issues that have traditionally fallen within the courts' interpretive domain. *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649, 110 S. Ct. 1384, 108 L.Ed.2d 585 (1990); *see also Smith v. Berryhill*, ––– U.S. ––––, 139 S. Ct. 1765, 1778–79, 204 L.Ed.2d 62 (2019); *Epic*, 138 S. Ct. at 1629. Take *Adams Fruit*. There, the agency issued a regulation

under its rulemaking authority that narrowly interpreted a cause of action allowing private parties to sue. 494 U.S. at 649, 110 S. Ct. 1384. The Court held that *Chevron* deference did not apply to this interpretation because "the scope of the judicial power vested by the statute" was for the courts, not the agency, to decide. *Id.* at 650, 110 S. Ct. 1384.

*Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 920 (6th Cir. 2021) (Murphy, J., dissenting).

Though written in dissent, Judge Murphy's discussion here is apt. And so is the similar discussion of Professor Eggert:

> *Chevron*'s great change was to declare that congressional delegation of interpretative authority to agencies could be implicit and derived from mere ambiguity in the statute, a fictional delegation granting agencies the power to interpret statutes they oversee where there are gaps in those statutes. As the Court later explained in *National Cable & Telecommunication Ass'n v. Brand X Internet Services*, "'[T]he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.' . . . *Chevron*'s premise is that it is for agencies, not courts, to fill statutory gaps." [545 U.S. 967, 981-82 (2005) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996))].
>
> . . . .
>
> There are important limits to the *Chevron* doctrine, though those limits are fuzzy and ill-defined. The Supreme Court has lurched about, trying to determine limitations of *Chevron*, where despite gaps in legislation agencies sought to fill, courts should not defer to agency interpretation and so should not apply the two steps of *Chevron*. The question of whether the *Chevron* framework should even apply comes before the two steps of *Chevron*, and so the determination of this issue is referred to as "*Chevron* Step Zero," a term invented by Merrill and Hickman, made popular by an influential law review article by Sunstein, and even adopted informally by the Court itself. Merrill and Hickman define Step Zero as "the inquiry that must be made in deciding whether courts should turn to the *Chevron* framework at all, as opposed to the *Skidmore* framework or deciding the interpretational issue de novo." While many different issues can come into play at Step Zero, "Step Zero analysis tends to focus on two factors: 'whether Congress delegated to the agency power to act with the force of law;' and whether the agency exercised 'such authority in adopting the interpretation at issue.'"
>
> . . .
>
> Step Zero analyses can be broken down to process concerns and substance concerns. Regarding process concerns, the court asks whether Congress authorized and the agency employed sufficiently formal process in reaching its interpretation of the statute to justify *Chevron* deference. Regarding substance concerns, the court queries whether the substance of the agency's interpretation determination indicates that Congress would not have intended courts to defer to that agency's

interpretation in this issue, regardless of the sufficiency and formality of the agency's process in finalizing that interpretation.

      Justice Breyer's decision for the Court in *Barnhart v. Walton* gave some indication of the factors, some substantive, some procedural, to be examined in a court's Step Zero analysis.

> In this case, the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue.

[535 U.S. 212, 222 (2002).]

      In Breyer's list, careful consideration by the agency is a process concern, and one which the agency can deal with through its actions. The "interstitial nature of the legal question, the related expertise of the Agency, the importance of the question, the complexity of that administration" are all substance questions, such that agencies cannot fix problems even through additional process.

Kurt Eggert, *Deference and Fiction: Reforming Chevron's Legal Fictions After* King v. Burwell, 95 Neb. L. Rev. 702, 718–19, 721-22, 724 (2017) (footnotes omitted).[9] Notably, several of the factors to which Justice Breyer referred are plainly fact-intensive, rather than matters of pure law.

---

[9] The "*Skidmore* framework" mentioned here is the analysis required to determine what degree of deference is owed to an agency decision under *Skidmore v. Swift & Co*., 323 U.S. 134 (1944) in cases where *Skidmore* (rather than *Chevron* on the one hand or perhaps no deference at all on the other hand) is applicable. *Skidmore* deference is "more limited" than Chevron deference. *Chao v. Occupational Safety & Health Rev. Comm'n*, 540 F.3d 519, 526 (6th Cir. 2008). "In contrast to the deferential review required by *Chevron,* under *Skidmore,* we give an agency interpretation deference that 'depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Id.* (quoting *Skidmore*, 323 U.S. at 140). Notably, Defendants do not assert the applicability of *Skidmore* deference in the present case, even as a "more limited" alternative to *Chevron* deference. Still less do Defendants explain how much *Skidmore* deference would be owed, or why such degree of deference is appropriate, or how any such deference ultimately supports Defendants' position on the Motion. Accordingly, the Court declines to give any consideration to any potential *Skidmore* deference.

It is also notable that FEMA can hardly claim any expertise in the interpretative questions here at issue, i.e., the manner of implementation of the right to appeal prescribed with great brevity in Stafford Act Section 423 (42 U.S.C. § 423). To the extent that FEMA has expertise, it lies in matters such as emergency management and hazard mitigation, not the proper implementation of the details of a congressionally-mandated appeals process.

Regarding *Auer* deference, the Supreme Court relatively recently has explained, "This Court has often deferred to agencies' reasonable readings of genuinely ambiguous regulations. We call that practice *Auer* deference, or sometimes *Seminole Rock* deference, after two cases in which we employed it." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019) (citing *Auer v. Robbins*, 519 U.S. 452 (1997), and *Bowles v. Seminole Rock & Sand Co.* ["*Seminole Rock*"], 325 U.S. 410 (1945)). The concept of *Auer* deference is implicated whenever "interpreting [a particular] regulation [promulgated by an agency] involves a choice between (or among) more than one reasonable reading." *Kisor*, 139 S. Ct. at 2411. In that situation, "'[t]o apply the rule to some unanticipated or unresolved situation, the court must make a judgment call." *Id.* In making such a judgment call, the Supreme Court has often indicated, "a court should defer to the agency's construction of its own regulation." *Id.* The general idea of *Auer* deference is that "when 'the meaning of [a regulation] is in doubt,' the agency's interpretation 'becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Seminole Rock*, 325 U.S. at 414). And the recognition of *Auer* deference is primarily "rooted in a presumption about congressional intent—a presumption that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities." *Id.* at 2412.

But the applicability of *Auer* deference is far from unqualified and ubiquitous:

> *Auer* deference is not the answer to every question of interpreting an agency's rules. Far from it. As we explain in this section, the possibility of

deference can arise only if a regulation is genuinely ambiguous. And when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation. Still more, not all reasonable agency constructions of those truly ambiguous rules are entitled to deference. As just explained, we presume that Congress intended for courts to defer to agencies when they interpret their own ambiguous rules. See *supra*, at 2411 - 2414. But when the reasons for that presumption do not apply, or countervailing reasons outweigh them, courts should not give deference to an agency's reading, except to the extent it has the "power to persuade." *Christopher*, 567 U.S. at 159, 132 S. Ct. 2156 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S .Ct. 161, 89 L. Ed. 124 (1944)). We have thus cautioned that *Auer* deference is just a "general rule"; it "does not apply in all cases." *Christopher*, 567 U.S. at 155, 132 S. Ct. 2156. And although the limits of *Auer* deference are not susceptible to any rigid test, we have noted various circumstances in which such deference is "unwarranted." *Ibid*. In particular, that will be so when a court concludes that an interpretation does not reflect an agency's authoritative, expertise-based, "fair[, or] considered judgment." *Ibid.* (quoting *Auer*, 519 U.S. at 462, 117 S. Ct. 905); cf. *United States v. Mead Corp.*, 533 U.S. 218, 229–231, 121 S. Ct. 2164, 150 L. Ed.2d 292 (2001) (adopting a similar approach to *Chevron* deference).

*Id.* at 2414. From this discussion, it is entirely clear that the applicability (or inapplicability) of *Auer* is fact-specific and context-specific, requiring consideration of at least: (i) "all standard tools of statutory construction" (which could include the very fact-specific task of analyzing legislative history)[10] to determine whether the regulation is ambiguous; (ii) whether the reasons for th[e] presumption [underlying *Auer* deference] do not apply; (iii) whether "countervailing reasons outweigh" the reasons supporting that presumption; and (iv) whether there are "circumstances in which [*Auer*] deference is 'unwarranted,'" such as when "[the] court concludes that an interpretation does not reflect an agency's authoritative, expertise-based, 'fair[, or] considered judgment.'"

The consequences of this on a motion to dismiss are both clear and significant. Only in the rarest of cases will the court be able to say at the motion-to-dismiss stage—based on the limited

---

[10] "Analysis of legislative history is, of course, a traditional tool of statutory construction." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 106 (2007)

things the Court properly may consider at the motion-to-dismiss stage (the allegations of the complaint and perhaps certain additional documents)—that *Auer* deference is appropriate.[11] And the Court concludes that this is not one of those rare cases. So to the extent that Defendants presently rely on *Auer* deference, that reliance is premature, and the Court presently will afford no *Auer* deference to the FEMA regulations implicated by the Motion.

ANALYSIS

The Court will address the Motion with respect to each of the Complaint's four counts in turn, although it opts to address Counts III and IV before Count II.

**I. Count I**

In Count I, Metro Nashville challenges on particular grounds FEMA's denial of its appeal ("Hazard Mitigation Appeal") of the Hazard Mitigation Denial. [12]

As Metro Nashville accurately states, citing paragraphs 87 and 88 of the Complaint, "[i]n Count I of the Complaint, Metro Nashville pled that it timely filed the [Hazard] Mitigation Appeal pursuant to 44 C.F.R. § 206.206(c)(1) and that TEMA timely forwarded the [Hazard] Mitigation Appeal to FEMA pursuant to 44 C.F.R. [§] 206.206(c)(2)." (Doc. No. 26 at 7). Metro Nashville also notes correctly that whether these (factual) allegations (and especially the disputed allegation

_____

[11] The Court was able to find little case law specifically addressing the extent to which *Auer* deference is properly invoked at the motion-to-dismiss stage; the below-quoted opinion from the U.S. District Court for the District of Columbia is one of the very few that makes a suggestion on this issue, and that suggestion is that applying *Auer* deference was inappropriate at the motion-to-dismiss stage at least in that particular case. The Court has reviewed many cases that do apply *Auer* deference at the motion-to-dismiss stage, but those cases do not actually address whether such application is premature at the motion-to-dismiss stage and do not account for the above-quoted discussion in *Kisor* making clear how fact-specific and context-specific the determination of *Auer* deference is.

[12] FEMA's denial of its appeal ("Insurance Deduction Appeal") of the Insurance Deduction Denial is not implicated in Count I (but is implicated in each of the other three counts).

that TEMA timely forwarded the Mitigation Appeal to FEMA) are true is a question of fact, and that for present purposes these allegations are accepted as true. (*Id.* at 7-8).

As Metro Nashville further notes correctly, "FEMA has boldly asserted, without any support in the Administrative Record, that FEMA did not receive this filing from TEMA until 2017." (*Id.* at 7). More specifically, FEMA (or, more precisely, Defendants) assert(s) that TEMA's letter forwarding Metro Nashville's appeal "was not received by FEMA until February 8, 2017." (Doc. No. 21 at 13).[13] The support that Defendants provide for this assertion consists only of a citation to the same assertion made by FEMA's Regional Administrator contained in Exhibit 6 to Defendants' Memorandum (Doc. No. 21-6), which is what Defendants call FEMA's "first appeal determination," i.e., the FEMA document announcing and justifying the Regional Administrator's decision denying Metro Nashville's first appeal of the Hazard Mitigation Denial. But as indicated above, the Court cannot rely on such an assertion to support the instant 12(b)(1) and 12(b)(6) motions in any way—let alone to refute Metro Nashville's factual allegation that TEMA timely forwarded the Hazard Mitigation Appeal to FEMA. Instead, just as Metro Nashville indicates, that allegation must be accepted as true.

This reality completely torpedoes Defendants' challenge to Count I's claim. With the allegation accepted as true, Metro Nashville has plausibly alleged that FEMA, in both its first appeal determination (made by FEMA's Regional Administrator) and its second appeal determination (made by FEMA's Assistant Administrator for the Disaster Assistance Directorate) made an evidentially unsupported and factually erroneous finding that the Hazard Mitigation Appeal was not forwarded to FEMA in a timely manner. And this in turn plausibly suggests that the second (and final) appeal determination (a denial, of course), which was allegedly based on

---

[13] Defendants also here assert, relatedly, that "FEMA has no record of the Grantee transmitting the first appeal to FEMA prior to February 8, 2017." (Doc. No. 21 at 13).

that allegedly erroneous factual finding, was in contravention of the APA. Thus, in Count I, Metro Nashville has plausibly alleged a right to relief (in the form of this Court setting aside the second appeal determination and directing FEMA to determine the Hazard Mitigation Appeal on the merits).

Accordingly, the Motion will be denied with respect to Count I.

## II.    Count III and Count IV

Count III is based on the theory that FEMA violated Section 325(a)(1) of the Stafford Act by: **(i)** adopting, in March 2017 and in particular after March 22,[14] a new policy (what the Court will call the "Appeal-Time-Bar Policy") whereby an appeal is deemed untimely if it was forwarded by the grantee to FEMA more than 60 days after the applicant filed it with the grantee, even if the applicant's filing with the grantee was timely; **(ii)** doing so without previously "provid[ing] for public notice and opportunity for comment," as required by Section 325(a)(1) of the Stafford Act, before adopting any new or modified policy that (A) governs implementation of the public assistance program administered by FEMA under the Stafford Act; and (B) could result in a significant reduction of assistance under the program; **(iii)** failing to provide such notice even though the Appeal-Time-Bar Policy was in fact of the specified type (satisfying criteria (A) and (B) just above) for which such public notice and opportunity for comment was in fact required; and **(iv)** invoking the Appeal-Time-Bar Policy to deny Metro Nashville's second (and final) appeals of the Hazard Mitigation Denial and Insurance Deduction Denial, respectively. Based on this theory, Metro alleges that it is entitled, under the APA, to have this Court "hold unlawful and set aside" FEMA's denial of those appeals as constituting final agency action that was "'in excess

---

[14] The Complaint alleges that the Appeal-Time-Bar Policy was adopted at the time of FEMA's issuance of its so-called *City of Pensacola* Second Appeal Determination, i.e., March 22, 2017. (Doc. No. 1 at ¶ 82).

of statutory jurisdiction, authority, or limitations, or short of statutory right,'" or "'without observance of procedure required by law.'" (Doc. No. 1 at ¶ 111 (quoting 5 U.S.C. § 706(2)).

Notably, allegations (i) and (ii) above are essentially factual allegations.[15] And as Metro Nashville notes, these factual allegations must be accepted as true. And once accepted as true, they plausibly support Count III's theory that Section 325(a)(1) required FEMA to provide public notice and an opportunity for comment, and that therefore FEMA's failure to so provide was in violation of Section 325(a)(1) of the Stafford Act.

The analysis of Count IV is largely, though not entirely, to like effect. Count IV is based on the theory that FEMA violated Section 325(a)(2) of the Stafford Act by: **(i)** newly adopting, in March 2017 (and in particular after March 22) the Appeal-Time-Bar Policy; **(ii)** applying it to a major disaster declared in May 2010, in violation of Section 325(a)(2) of the Stafford Act, which does not allow new policies to be applied retroactively to disasters that predated the policy change; and **(iii)** using application of the new policy to justify denying Metro Nashville's second appeals of the Hazard Mitigation Denial and Insurance Deduction Denial, respectively. Based on this theory, Metro Nashville alleges that it is entitled, under the APA, to have this Court "hold unlawful and set aside" FEMA's denial of those appeals as constituting final agency action that was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." (Doc. No. 1 at ¶ 117 (quoting 5 U.S.C. § 706(2))). And

---

[15] The Court realizes that whether a policy is "new" in some cases may be less a question of the underlying facts (such as, for example, what was the prior policy and what was the policy as changed) and more a question of whether the underlying facts reasonably support the (subjective, non-factual) verbal characterization of the policy as changed as being a "new" policy. But in the present case, there is little room for doubt that Plaintiff has alleged a policy as changed (in March 2017) that is fairly described as "new" vis-à-vis the prior policy, which was to the exact opposite effect of the policy as changed. Under these circumstances, under any reasonable construction of the subjective term "new," the policy as changed (the Appeal-Time-Bar Policy) was "new," and the alleged facts dictate this as pretty much a factual matter, and not just a matter of mere verbal characterization.

once Metro Nashville's underlying factual allegations are accepted as true, they plausibly support Count IV's theory that Section 325(a)(2) prohibited application of the Appeal-Time-Bar Policy to Metro Nashville's appeals.

The respective plausible theories underlying each of these counts supports the relief requested by Metro Nashville, namely the setting aside of the denial of each of Metro Nashville's second appeals as violative of the APA. Therefore, Metro Nashville's factual allegations plausibly support an entitlement to relief requested in Count III and Count IV. And so the pleading standard of *Iqbal* and *Twombly* is satisfied with respect to those two counts. It is certainly conceivable that the underlying factual allegations ultimately will prove unsubstantiated in one or more material ways, but this is a possibility that becomes relevant no earlier than the summary-judgment stage, and not at the present motion-to-dismiss stage.

The Court notes that it is not the first Court to address the manner in which a plaintiff's factual allegations of a new federal agency policy can defeat a motion to dismiss a claim grounded on the agency implementing the new policy without jumping through required metaphorical hoops. The United States District Court for the District of Columbia has done so in a case that happened to involve the below-referenced requirement for a "reasoned explanation" for an agency's change to a new policy, rather than the Stafford Act's notice-and-comment requirements for an agency to change to a new policy. As the court there cogently explained:

> The Supreme Court repeatedly has emphasized that "[r]egulatory agencies do not establish rules of conduct to last forever," *Am. Trucking Ass'ns, Inc. v. Atchison, T. & S.F.R. Co.*, 387 U.S. 397, 416, 87 S. Ct. 1608, 18 L. Ed.2d 847 (1967), and "administrative authorities must be permitted, consistently with the obligations of due process, to adapt their rules and policies to the demands of changing circumstances," *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 784, 88 S. Ct. 1344, 20 L. Ed.2d 312 (1968). *See also Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417, 113 S. Ct. 2151, 124 L.Ed.2d 368 (1993) ("[A]n administrative agency is not disqualified from changing its mind") (citation and internal quotation marks omitted); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545

U.S. 967, 981, 125 S. Ct. 2688, 162 L. Ed.2d 820 (2005) ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances." (citation and internal quotation marks omitted)).

However, if an agency does undertake an action inconsistent with past practice, it is "obligated to supply a reasoned analysis for the change." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 42, 103 S. Ct. 2856, 77 L. Ed.2d 443 (1983); *see also Encino Motorcars, LLC v. Navarro*, ––– U.S. ––––, 136 S. Ct. 2117, 2125, 195 L. Ed.2d 382 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."). The "reasoned analysis" requirement does not demand that an agency "demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S. Ct. 1800, 173 L. Ed.2d 738 (2009).

Two recent Supreme Court decisions inform when—as a factual matter— an agency can be deemed to have changed its past position and thus adopted a new rule. In *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 132 S. Ct. 2156, 183 L. Ed.2d 153 (2012), the Supreme Court examined whether a Department of Labor interpretation of its own regulations qualified for *Auer* deference. Under *Auer*, "[a]n agency's [reasonable] interpretation of its own ambiguous regulations" is generally controlling. *MarkWest Mich. Pipeline Co. v. FERC*, 646 F.3d 30, 36 (D.C. Cir. 2011). The Court in *Christopher* declined to extend *Auer* deference to the Department of Labor's interpretation of its regulations because the agency's position was a "surprise" deviation from its long-acquiescence to a standard industry practice:

> [D]espite the industry's decades-long practice of classifying pharmaceutical detailers as exempt employees, the [Department of Labor] never initiated any enforcement actions with respect to detailers or otherwise suggested that it thought the industry was acting unlawfully. We acknowledge that an agency's enforcement decisions are informed by a host of factors, some bearing no relation to the agency's views regarding whether a violation has occurred. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S. Ct. 1649, 84 L. Ed.2d 714 (1985) (noting that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise"). *But where, as here, an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is*

> *acute*....Accordingly, whatever the general merits of *Auer* deference,
> it is unwarranted here.

132 S. Ct. at 2168 (emphasis added) (footnote omitted).

More recently, in *Encino Motorcars*, the Supreme Court again emphasized that, when an agency takes a position at odds with long-standing industry practice to which the agency has acquiesced, it has announced a new rule. In *Encino Motorcars*, at issue was a Department of Labor regulation which interpreted the Fair Labor Standards Act to cover certain employees of auto dealerships, known as service advisors, for overtime pay. *See* 136 S. Ct. at 2121–22. For decades, the Department of Labor had taken the position that service advisors were not eligible for overtime pay. *See id.* at 2123. Then, in 2011, it changed positions, with minimal explanation, and adopted a regulation making service advisors eligible for overtime pay. *See id.* In finding that the Department of Labor had changed its position, the Court emphasized that "[t]he retail automobile and truck dealership industry had relied since 1978 on the Department's position that service advisors are exempt from the FSLA's overtime pay requirement." *Id.* at 2126. The Court noted that the dealership industry had negotiated and structured compensation plans against this background and now could face substantial FSLA liability. *See id.* The Court concluded:

> In light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision. This lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier positions results in a rule that cannot carry the force of law. It follows that this regulation does not receive *Chevron* deference in the interpretation of the relevant statute.

*Id.* at 2127 (citations omitted).

As *Christopher* and *Encino Motorcars* make clear, two consequences flow from an agency's change in position. The first is that "the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id.* at 2126 (citation and internal quotation marks omitted). Importantly, "[i]n explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (citation and internal quotation marks omitted); *see also Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742, 116 S. Ct. 1730, 135 L.Ed.2d 25 (1996) ("[C]hange that does not take account of legitimate reliance on prior interpretation . . . may be 'arbitrary, capricious [or] an abuse of discretion.'"). The second consequence is that, if the agency fails to acknowledge a change and adequately explain it, the changed position will be afforded no deference in litigation under either *Chevron* or *Auer. See Encino Motorcars*, 136 S. Ct. at 2127; *Christopher*, 132 S. Ct. at 2168–69.

. . .

      On a motion to dismiss, the court must, of course, accept the "factual allegations ... as true," *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 67 (D.C. Cir. 2015), and "construe the complaint 'in favor of [the plaintiff] who must be granted the benefit of all inferences that can be derived from the facts alleged,'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979). Here, based on the allegations in the Complaint, the court finds that Plaintiff has sufficiently pleaded that [a U.S. Department of Education prohibition of certain loan-collection practices announced in a so-called] Dear Colleague Letter amounts to a new rule. What that means, under *Christopher* and *Encino Motorcars*, is that the Department was required by the APA to acknowledge that it had changed its position and to provide a reasoned explanation for the change, taking into consideration the industry's reliance on the agency's prior position. Having reviewed the Dear Colleague Letter—which is the only record evidence before the court—the court concludes that Plaintiff has stated a plausible claim that the Department did not adhere to those procedural requirements. The Dear Colleague Letter arguably does not acknowledge a change in agency position; nor does it explicitly consider the industry's reliance interests that may have developed based on the agency's previous position. Accordingly, Plaintiff has stated a plausible procedural violation of the APA sufficient to withstand the motion to dismiss.

*U.S. Aid Funds, Inc. v. King*, 200 F. Supp. 3d 163, 169–71, 172 (D.D.C. 2016).

The Court finds this discussion persuasive and applicable here.[16] In the instant case, Metro Nashville has alleged a change in FEMA policy, namely from virtually always allowing an applicant's appeal irrespective of whether it was forwarded to FEMA by the grantee within 60 days, to the Appeal-Time-Bar Policy (i.e., denying the applicant's appeal because it was not forwarded within those 60 days). And in Count III, Metro Nashville has alleged that the Appeal-Time-Bar Policy was implemented without adherence to the Stafford Act's notice-and-comment requirements for an agency to change to a new policy. Additionally, in Count IV, Metro Nashville

---

[16] The Court finds that the applicability and persuasiveness of this discussion in the instant case is not impaired by the fact that the plaintiffs in *United Student Aid Funds* complained of alleged violations of the "reasoned explanation" requirement, whereas Metro Nashville complains of (alleged) violations of the Stafford Act's notice-and-comment requirement. And the persuasive weight of this discussion, in the Court's view, is enhanced by the fact that it was provided by a particular district court that, being located at the seat of the national government, is especially experienced in addressing federal administrative-law issues like this one.

has alleged that this change was implemented retroactively, long after the 2010 Nashville floods, in violation of Stafford Act Section 325(a)(2).

Moreover, construing the Complaint in favor of Metro Nashville as required, it is easily inferable that this change was implemented without providing a "reasoned explanation" as required by *Motor Vehicle Mfrs. Assn.* for such a change. So Metro Nashville has plausibly alleged that FEMA's implementation of the Appeal-Time-Bar Policy was in multiple ways contrary to the Stafford Act and, for that matter, the APA. And these plausible allegations support the particular relief requested by Metro Nashville in Counts III and IV. *See Rolling Meadow Ranch Groves, LLC v. United States Dep't of Agric.*, No. 21-14058-CIV, 2023 WL 5300431, at *6 (S.D. Fla. July 16, 2023) (noting that when the court "is left with an agency action that is contrary to law . . . [,] [t]he proper remedy under the APA is to set that agency action aside." (citing 5 U.S.C. § 706(2)(A))). And so Metro Nashville has stated valid claims for relief in Counts III and IV.

Potential invocation of *Chevron* deference or *Auer* deference cannot and does not change this result. To begin with, the Court agrees with *United Student Aid Funds* that if the agency fails to acknowledge a change and adequately explain it, the changed position will be afforded no deference under either *Chevron* or *Auer*. And, construed in Metro Nashville's favor, the Complaint alleges just such a failure by FEMA in connection with the Appeal-Time-Bar Policy. Under the circumstances, and at the present motion-to-dismiss-stage, the Court declines to afford the alleged new policy either *Chevron* deference or *Auer* deference for additional reasons as well, which the Court discusses in the following two paragraphs.

With respect to *Chevron* deference, as indicated above an agency's interpretation of a statute is not entitled deference if it is unreasonable. FEMA's interpretation of the Stafford Act at issue on Counts III and IV is that the Stafford Act permits (or even requires) FEMA to invoke the

Appeal-Time-Bar Policy as it did in the instant case. Metro Nashville has plausibly alleged, in Count III and Count IV,[17] respectively, reasons why that interpretation is unreasonable; that is, it has plausibly alleged that the interpretation is squarely inconsistent with Stafford Act Section 325(a)(1) and Stafford Act Section 325(a)(2), respectively. And the Court is mindful of the Supreme Court's admonition (one made with textual emphasis) that the overarching question involved when potential *Chevron* deference is raised is "*whether the agency has stayed within the bounds of its statutory authority.*" *City of Arlington,* 569 U.S. at 297. Metro Nashville has alleged facts plausibly suggesting that in this case the correct answer is "no" under the theory that FEMA exceeded its authority, as limited by Stafford Act Sections 325(a)(1) and 325(a)(2), respectively: (i) with respect to Count III, by rolling out the Appeal-Time-Bar Policy without providing notice and an opportunity for comment, and (ii) with respect to Count IV, by applying it retroactively in this case. So Count III and Count IV survive the Motion, irrespective of any assertion of *Chevron* deference—deference that, it bears repeating, is not warranted at the instant stage even if it remains potentially applicable at later stages.

With respect to *Auer* deference, the Court first notes that Defendants' view is that FEMA's denial of Metro Nashville's second appeal on the grounds of untimeliness was based on a straightforward application of the (then-applicable) version of 44 C.F.R. § 206.206(c), which provides that "(1) Appellants [in the instant case, Metro Nashville] must file appeals within 60 days after receipt of a notice of the action that is being appealed. (2) *The grantee* [in the instant case, TEMA] *will review and forward appeals from an applicant or subgrantee* [in the instant

---

[17] By contrast, the same cannot necessarily be said with respect to the Stafford Act provision at issue in Count II (namely section 423 of the Stafford Act, 42 U.S.C. 5189a(a)); as discussed below, the Court cannot say at this time that Metro Nashville has plausibly alleged a FEMA interpretation of Section 423 (as manifested in 42 C.F.R. § 206.206(c)(2) and the Appeal-Time-Bar Policy based thereon) that is squarely inconsistent with Section 423. Nevertheless, for reasons discussed below, that FEMA interpretation nevertheless is unentitled to *Chevron* deference at the present stage.

case, Metro Nashville], with a written recommendation, to the Regional Director *within 60 days of receipt*." 44 C.F.R.§ 206.206(c)(1)-(2) (emphasis added). The problem for Defendants, however, is that this regulation does not specify the consequences of the grantee *not* doing what the regulation says the grantee "will" do, i.e., forward the appeal to FEMA's Regional Director within 60 days. Even if one reads "will" to mean "must," that does not necessarily mean that the consequence of the *grantee* not forwarding the appeal within 60 days (as, arguendo, it "must" do) is that the *applicant/subgrantee*'s appeal can be deemed time-barred, let alone that the appeal is automatically and without exception time-barred; there could conceivably be only lesser consequences, such as a requirement to refile the appeal and begin from scratch, pay a late fee, justify the late filing, etc. The upshot is that FEMA's view—that an appeal forwarded by the grantee past the 60-day deadline is time-barred, either automatically or at least potentially within the exercise of FEMA's discretion—reflects the agency's own interpretation. For now, the Court is not opining that such an interpretation is unreasonable; especially to the extent that FEMA claims that it at least has the *discretion* to deny (or not deny) such an appeal as untimely, FEMA's interpretation of 44 C.F.R. § 206.206(c) well may be reasonable.

Nevertheless, as discussed above, the Court declines to grant *Auer* deference to such an interpretation at the current motion-to-dismiss stage, for reasons that go beyond the independently adequate reasons identified in *United Student Aid Funds*. The Court has already noted above that application of *Auer* deference is a fact-and-context-specific matter premature for determination on the instant motion to dismiss in any event. And affording *Auer* deference to the Appeal-Time-Bar Policy is additionally inappropriate here because Metro Nashville has plausibly alleged in Counts III and IV that such an interpretation is contrary to law, i.e., sections 325(a)(1) and (a)(2) of the Stafford Act.

The inapplicability of *Chevron* deference and *Auer* deference at the present stage thus provides further grounds for rejecting (for now, at least) Defendants' apparent arguments that the Appeal-Time-Bar Policy reflects (i) a valid interpretation of Section 423 the Stafford Act; and/or (ii) a valid interpretation of 44 C.F.R.§ 206.206(c)(2).

### III. Count II

In Count II, Metro Nashville alleges that FEMA's denial of its respective appeals of both the Hazard Mitigation Denial and the Insurance Deduction Denial were contrary to Stafford Act Section 423. Metro Nashville's theory is that because the Stafford Act expressly grants a right of appeal to any applicant who appeals "within 60 days after the date on which the applicant for such assistance is notified of the award or denial of award of such assistance," and because Metro Nashville (the applicant here) did submit within 60 days an appeal (to the grantee, TEMA) it is unlawful for FEMA to deny an applicant such right of appeal on the grounds that the grantee (in this, case, TEMA) did not forward Metro Nashville's appeal to FEMA within 60 days after Metro Nashville's timely submission to TEMA. (Doc. No. 1 at ¶¶ 94-101).

In attempting to refute this claim via their Motion, Defendants unsurprisingly claim that the complained-of denial is entirely lawful because it is specifically authorized by FEMA regulations promulgated to implement Section 423 of the Stafford Act, *i.e.*, 44 C.F.R. § 206.206(c).

Metro Nashville appropriately concedes that "[a]s specified by the Stafford Act, FEMA may adopt rules to ensure 'the fair and impartial consideration of appeals' in a manner consistent with the Stafford Act.'" (*Id.* at ¶ 98 (quoting Stafford Act § 423(c))). But it asserts that "FEMA's administrative process may not nullify, contradict, abridge, or alter applicant Metro Nashville's 'RIGHT OF APPEAL' provided by the Stafford Act," *id.*, which Metro Nashville contends is nevertheless exactly what happened here by virtue of FEMA's regulations, i.e. 44 C.F.R.

§ 206.206(c) as interpreted by FEMA to prescribe the Appeal-Time-Bar Policy. More specifically, Metro Nashville alleges (apparently without any disagreement from Defendants) that FEMA has invoked its administrative regulation at 44 C.F.R. § 206.206(c) to abridge Metro Nashville's right of appeal based on the alleged tardiness of the *grantee* (TEMA) in forwarding the appeal of *the applicant/subgrantee* (Metro Nashville). Metro Nashville contends essentially that such an action is beyond the statutory authorization of FEMA because (according to Metro Nashville) the Stafford Act requires FEMA to honor *any* appeal made "within 60 days after the date on which the applicant for such assistance is notified of the award or denial of award of such assistance," 42 U.S.C. § 5189a(a), meaning that FEMA has no statutory authorization to reject an appeal based an alleged failure of the *grantee* to *forward* the applicant's appeal.

This theory is at least colorable, which is why it was essentially embraced in an administrative decision by the Civilian Board of Contract Appeals ("CBCA") in *In the Matter of City of Beaumont, Texas*, Cbca, 22-1 Bca ¶ 38,018, Cont. App. Dec. P 38018 (CBCA No. 7222-FEMA Jan. 12, 2022). There, the CBCA noted that the applicant, the City of Beaumont, Texas, had timely filed its appeal with the grantee (which the CBCA called the "recipient"), the Texas Division of Emergency Management. It then explained:

> FEMA tells us, however, that for the timely filing of an appeal, it is not enough for the applicant to file its appeal with the recipient within sixty days. FEMA states that, after the applicant files its appeal with the recipient within the sixty days as provided in the Stafford Act, the recipient must then forward the appeal to FEMA within another sixty days pursuant to 44 CFR 206.206(c)(2). If the recipient fails to forward to FEMA the timely-filed appeal within that additional sixty-day period, FEMA deems the appeal untimely and the applicant loses any right to challenge FEMA's underlying decision. Thus, FEMA essentially transforms the Stafford Act's sixty-day filing deadline into a 120-day bifurcated deadline with its regulation. There are two problems with FEMA's approach.
>
> First, FEMA changes the statutory mechanism for the appeal process by injecting the recipient into the process, leaving the applicant with no control over the recipient's action to forward the appeal to FEMA. The statute says nothing

about any *further* requirement that, for the appeal to be considered timely, the recipient would have to forward it on to FEMA within the *next* sixty-day period. To the contrary, the statute gives the right to appeal to the applicant, who perfects its appeal by filing it within sixty days after receiving notice of the funding denial. The statute does not contemplate that, once the applicant files a timely appeal within the sixty-day deadline contemplated by the statute, the appeal may retroactively be deemed untimely because FEMA's designated agent for accepting the applicant's appeal did not act appropriately in subsequently administering the timely-filed appeal.

Second, FEMA argues that it lacks the authority to waive these deadlines if either sixty-day submission is late. We do not agree. Statutory time limits are not jurisdictional bars unless there is clear congressional intent to make them such. A court may look at the plain language of the provision and the context of the time limit within the statute to determine if a statutory time limit is jurisdictional. *Henderson v. Shinseki*, 562 U.S. 428, 438-41 (2011). In *Henderson*, the Court concluded that the 120-day appeal deadline for an adverse veterans benefits determination in 38 U.S.C. § 7266(a) was not jurisdictional because the statutory deadline lacked jurisdictional attributes and imposing a rigid jurisdictional bar in the procedural context for benefits determinations for veterans would clash with the remedial and non-adversarial scheme of the statute. As in *Henderson*, we do not find jurisdictional attributes in the Stafford Act language. Treating the first appeal deadlines for FEMA determinations as rigid jurisdictional bars would clash with the remedial and non-adversarial scheme of the Stafford Act for providing public assistance benefits. *See id*. at 440-41. Furthermore, under 42 U.S.C. § 5141, a related Stafford Act provision, Congress authorizes FEMA to modify or waive administrative conditions when the disaster affects an applicant's ability to comply with such conditions. Further supporting that these sixty-day deadlines are not jurisdictional but rather procedural is that FEMA itself has repeatedly granted waivers and extensions of the appeal filing deadlines both retroactively and prospectively over the years, most recently in response to the disruptions caused by the pandemic. In the present matter, we find under the circumstances that TDEM's seven-day delay in forwarding the City's appeal to FEMA was an administrative delay in processing the otherwise timely-filed appeal. Accordingly, we find the City's first-level appeal to be timely submitted.

FEMA cites to a district court decision in *City of Pembroke Pines v. Federal Emergency Management Agency*, 510 F. Supp. 3d 1126 (S.D. Fla. 2021), as holding that FEMA was entitled to create by regulation an appeal system that required the applicant to rely on the recipient to forward a timely-filed appeal to FEMA within an additional sixty-day period not identified in the Stafford Act. *With all due respect to the district court, given the Stafford Act's sixty-day appeal deadline and the right that the statute gives the applicant to decide whether to submit an appeal, we disagree with the district court's decision to the extent that it finds that the recipient's failure to forward an applicant's timely-filed appeal (within the sixty-day period after the recipient receives it) renders the appeal untimely.* Further, we

are an arbitration panel, not a district court reviewing agency action, and as explained earlier, our arbitration decision replaces final action by FEMA. In *Livingston Parish Government*, we stated: "As explained in the preamble to our arbitration rulemaking, 'because an arbitration decision replaces final action by FEMA' and a panel is not a reviewing court, 'the arbitrators must find facts and interpret the law independently on behalf of the Executive Branch.'" CBCA 6513-FEMA, 19-1 BCA ¶ 37,436 (quoting 84 Fed. Reg. 7861, 7862); *see also Howsam v. Dean Witter Reynolds, Inc*., 573 U.S. 79, 85 (2002) (citing the Revised Uniform Arbitration Act, which states that perquisites, such as time limits, among others, "are for the arbitrators to decide").

*Id.* (emphasis added). Of course, neither the decision of the CBCA, nor the contrary decision of

the U.S. District Court for the Southern District of Florida,[18] is binding on this Court. But the Court

---

[18] It is fair to say that in *City of Pembroke Pines*, the Southern District of Florida rejected essentially the same argument, presented by the applicants there (three Florida cities), that the applicant (Metro Nashville) makes here:

> The Cities' claims also seem to assert that 44 C.F.R. § 206.206(c)(2) runs contrary to 42 U.S.C. § 5189a, because it interferes with an applicant's statutory right to an appeal. They seem to take issue with FEMA's promulgation of 44 C.F.R. § 206.206, framing it as FEMA having "inserted the state grantee into the appeals process" and requiring that appeals be timely submitted both to and by the recipient. But, as FEMA points out, the Cities have not presented any evidence that they challenged the regulation when it underwent notice and comment. Nor, years later, when FEMA deobligated certain funds, did the Cities sue FEMA under the APA for acting contrary to protections they now assert under § 705(c).

> FEMA responds by pointing to the fact that the deadlines in 44 C.F.R. § 206.206(c)(2) have "long been in place," and constitute an appropriate exercise of administrative authority. The Stafford Act does not describe the specific manner in which FEMA must implement its administrative appeal process, but rather authorizes FEMA to promulgate rules for such appeals. *See* 42 U.S.C. § 5189a(c) ("The President shall issue rules which provide for the fair and impartial consideration of appeals under this section."). Consistent with this, FEMA promulgated such rules at 44 C.F.R. § 206.206 specifying the manner in which administrative appeals are to be carried out in furtherance of the Stafford Act. FEMA's administrative appeal regulations set forth requirements for appeals processing and time limits for the parties to take certain actions, including the recipient's responsibility to forward to FEMA the municipality's appeal with its recommendation within sixty days of receipt. 44 C.F.R. § 206.206(c)(2).

> Here, FDEM's [the grantee's] failure to comply with FEMA's regulations by forwarding the Cities' appeals to FEMA does not mean that FEMA violated the Cities' right to an appeal. Indeed, FEMA followed its administrative appeal regulations as set forth in 44 C.F.R. § 206.206.

finds the CBCA's discussion above telling, even though CBCA's role is certainly different than the role of a federal district court. In particular, CBCA's discussion tends to show that 42 U.S.C. § 5189a(a): (i) is ambiguous as to whether FEMA properly can reject an appeal based the grantee's not doing do what 44 C.F.R. § 206.206 says the grantee "will" do within 60 days, given that the Stafford Act has nothing to say about what a grantee "will" or must do in this regard, let alone indicate that an appeal must (or even *may*) be denied as untimely based on what the grantee did not do in this regard; and (ii) can reasonably be construed (as it was by the court in *City of Pembroke Pines*) as allowing FEMA to deny an appeal based on the grantee not doing what 44 C.F.R. § 206.206 says the grantee will do within 60 days.

One initially might conclude from this that 44 C.F.R. § 206.206(c)(2) is entitled to *Chevron* deference, i.e., that the Court must defer to FEMA's choice to fill in the gaps (as to the proper *procedure* for an appeal) left by 42 U.S.C. § 5189a(a) with (inter alia) a provision that the applicant's appeal "will" (read by the Court as "must" for present purposes) be forwarded by the grantee to FEMA within the 60-day window. After all, as just noted, it tends to seem that 42 U.S.C. § 5189a(a) can reasonably be construed both as ambiguous and as authorizing FEMA to—as the court described the plaintiffs putting it in *City of Pembroke Pines*, 510 F. Supp. 3d at 1139— "insert[ ] the state grantee into the appeals process" and requiring that appeals be timely submitted both to and by the recipient [i.e. state grantee]." So Defendants have a strong argument that both questions (steps) in the *Chevron* analysis go in their favor, such that *Chevron* deference applies.

---

*City of Pembroke Pines*, 510 F. Supp. 3d at 1139 (footnote omitted). Notably, the court's determination there was made in adjudicating a motion to dismiss filed by FEMA. The court's determination would have been, in the view of the undersigned, at least colorable, had it been made at a more appropriate time. As explained herein, the undersigned takes issue not with the ultimate merits of such a determination, but rather with the fact that the determination was made at the motion-to-dismiss stage—i.e., at a time when *Chevron* step-one considerations typically (and certainly in the present case) have not been adequately explored (via, e.g., discovery) or briefed (on the motion to dismiss).

The problem for Defendants, however, is that they simply do not address *Chevron* step zero at all, and thus do not explain why *Chevron* deference is not precluded from the get-go, before steps one and two are even reached. This cripples the bid of Defendants—who as noted above have the burden of explanation on the instant Motion—to attain application of *Chevron* deference with respect to Metro Nashville's Count II challenge to the Appeal-Time-Bar Policy that is derived from FEMA's interpretation of 44 C.F.R. 206.206(c). In any event, had Defendants attempted to show why the outcome of *Chevron* step zero results in no obstacle to proceeding to steps one and two, they likely would have made no headway. As indicated above, the analysis under *Chevron* step zero turns on consideration of multiple factors, none of which are adequately illuminated (one way or the other) at the present motion-to-dismiss. At least under these circumstances, application of *Chevron* deference on the instant Motion would be premature.[19]

Absent the current applicability of *Chevron* deference, Metro Nashville has a colorable claim that as a matter of law FEMA acted in excess of its statutory authority by injecting the grantee into the appeal process (including timing deadlines) via the Appeal-Time-Bar Policy purportedly grounded in 44 C.F.R. § 206.206(c)(2). And this is true even if the argument to the contrary is colorable; if *Chevron* deference never becomes applicable in this case (which remains a possibility), then Defendants can prevail not merely by showing that 44 C.F.R. § 206.206(c) represents a *reasonable* interpretation of 42 U.S.C. § 5189a(a), but rather only by showing that it is ultimately an interpretation that the Court (deciding *de novo*) finds to be a correct interpretation.

---

[19] Consistent with what it has suggested in a footnote above, the Court is aware that courts typically do not find that application of *Chevron* deference at the motion-to-dismiss stage is premature. But in the Court's view, this is not because they affirmatively *reject* the notion of such prematurity, but rather because they have *given no thought* to the possibility of such prematurity—and certainly no thought to whether step zero, by its very nature, tends to make application of *Chevron* deference inappropriate at the motion-to-dismiss stage.

Finally, the Court must reiterate something it said above: Defendants cannot prevail on the Motion by virtue of their alternative argument that even if FEMA's rejection of Metro Nashville's appeals was not *mandatory*, it was authorized as an act within FEMA's discretion and thus unreviewable by this Court. The Court has explained this conclusion above in addressing Defendants' current facial challenge to subject-matter jurisdiction. And the Court additionally notes that in connection with Count II, Metro Nashville has alleged in effect that even a *discretionary* denial of an appeal based on Section 206.206(c) was in excess of the statutory authority granted FEMA 42 U.S.C. § 5189a(a). At least in the absence of *Chevron* deference, this allegation is plausible.

<u>CONCLUSION</u>

Metro Nashville's claims ultimately may or may not prove sustainable. For any number of reasons (including the potential future application of *Chevron* deference and/or *Auer* deference), it is possible that the eventual correct conclusion will be that FEMA was authorized or even required to deny the second appeals. Time will tell. But the Court cannot so conclude at the mere pleading stage, which of course is where Defendants' Motion has been interposed.

Accordingly, the Motion (Doc. No. 20) will be DENIED in its entirety.

An appropriate corresponding order will be entered.


*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE